**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 21-CV-1035

KAREN GARNER,

      Plaintiff,

v.

CITY OF LOVELAND, a Colorado municipality,
OFFICER AUSTIN HOPP, Loveland Police Officer, in his individual capacity,
OFFICER DARIA JALALI, Loveland Police Officer, in her individual capacity, and
SERGEANT PHILIP METZLER, Loveland Police Officer, in his individual capacity.

      Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

      Plaintiff Karen Garner, by and through her attorney Sarah Schielke of The Life & Liberty Law Office, respectfully alleges for her *Complaint and Jury Demand* as follows:

## I. INTRODUCTION

1. This is an action for damages and other relief against the Defendants pursuant to 42 U.S.C. § 1983 and Title II of the Americans With Disabilities Act (42 U.S.C. §§ 12101-12213).

2. In the late afternoon of June 26, 2020, Defendant Officer Hopp violently assaulted Plaintiff, without provocation, as she was walking home from Walmart. Ms. Garner is 73 years old and has suffers from dementia and sensory aphasia, which impairs her ability to communicate and understand. Officer Hopp pulled up behind Ms. Garner, called out to her to stop and talk to him, and when she indicated she did not understand him, he violently assaulted her, twisting her arms behind her back, throwing her to the ground and handcuffing her. Defendant Officer Jalali materially assisted Officer Hopp with these civil rights violations and also failed to

1

intervene. Supervising officer Defendant Sergeant Metzler approved of this brutality, helped his subordinates to cover it up, and then directed that Ms. Garner be denied access to medical care for her injuries afterward.

3.   In their efforts to repeatedly and needlessly injure and subdue the terrified Ms. Garner, Officers Hopp and Jalali fractured and dislocated her shoulder in addition to other injuries (scrapes to face, bloody nose, contusions to knees). Despite the visible dislocation of her arm from her shoulder, and her repeated cries of pain while on scene and in the several hours she remained in their care and control that followed, neither the defendant officers nor anyone else at the Loveland Police Department sought medical care for Ms. Garner, instead keeping her in extreme pain, in handcuffs, and actively preventing her from access to medical treatment for over six hours.

4.   The defendants' proffered justification for all this? Ms. Garner was suspected of having exited a Walmart without paying for $13.88 of items. Walmart employees had stopped her at the exit and retrieved the items, however, and then refused to let her pay. Forgetting to pay for items at a store is one of the most common and well-known symptoms witnessed in elderly persons suffering from dementia.

5.   Nearly 20 percent of *all* adults of Ms. Garner's age or more are suffering from some form of dementia.

6.   The Larimer County District Attorney's Office dismissed the criminal case that Loveland Police had filed against Ms. Garner shortly thereafter.

7.   The Defendant officers violated Plaintiff Ms. Garner's civil rights and the ADA in this outrageous manner because the Loveland Police Department had failed to properly train them and had established customs and practices of encouraging and condoning such civil rights

violations. To any extent that the Defendant officers' misconduct was not pursuant to such customs, it was the direct result of Defendant City of Loveland's and their supervising officer Sergeant Phil Metzler's failure to supervise and train the officers regarding the reasonable use of force, particularly in the context of interacting with at-risk, elderly and disabled citizens. The City of Loveland and its supervisory personnel were all well aware of the risks that its officers and policies presented to the safety of the public, particularly the vulnerable, elderly, disabled, and at-risk, like Ms. Garner, and were deliberately indifferent to the same.

8. The Defendants' actions caused Plaintiff Ms. Garner to endure physical injury, pain, suffering, humiliation, extraordinary trauma, emotional distress and other damages.  What little freedom and happiness Ms. Garner enjoyed in her life as an elderly adult with declining mental health was, on June 26, 2020, recklessly and deliberately obliterated by the Loveland Police Department.

## II.  JURISDICTION AND VENUE

9. This action arises under the Constitution and laws of the United and is brought pursuant to 42 U.S.C. § 1983; the Americans with Disabilities Act, 42 U.S.C. § 12131; and the Rehabilitation Act, 29 U.S.C. § 794.

10. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331 and 1343(a)(3).

11. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

12. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado or were directed at individuals within the State of Colorado.

## III. PARTIES

13. Plaintiff, Karen Garner, is a citizen of the United States and a resident of the State of Colorado. She resides in Jefferson County.

14. Defendant City of Loveland was at all times relevant to this Complaint, a Colorado municipality.

15. Defendant Austin Hopp is a natural person, and was at all times relevant to this Complaint duly appointed and sworn as a police officer for the City of Loveland in Loveland, Colorado. At all times relevant hereto Defendant Hopp was acting under color of law, including when his actions were in violation of the Constitution and laws of the State of Colorado and the Constitution and laws of the United States of America. Officer Hopp is a named Defendant in his individual capacity.

16. Defendant Daria Jalali is a natural person, and was at all times relevant to this Complaint duly appointed and sworn as a police officer for the City of Loveland in Loveland, Colorado. At all times relevant hereto, Defendant Jalali was acting under color of law, including when her actions were in violation of the Constitution and laws of the State of Colorado and the Constitution and laws of the United States of America. Officer Jalali is a named Defendant in her individual capacity.

17. Defendant Phil Metzler is a natural person, and was at all times relevant to this Complaint duly appointed and sworn as a sergeant officer for the City of Loveland's police department in Loveland, Colorado. At all times relevant hereto, Defendant Metzler was acting under color of law, including when his actions were in violation of the Constitution and laws of the State of Colorado and the Constitution and laws of the United States of America. Sergeant Metzler is a named Defendant in his individual capacity.

## IV. FACTUAL ALLEGATIONS

18. Ms. Garner is 73 years old, five feet tall, and weighs just 80 pounds.

19. Ms. Garner is also an at-risk elderly adult suffering from mental disabilities. At the time of this incident, according to her doctor, she had a "cognitive picture of cortical dementia with lack of insight, disorientation, and sensory aphasia."

    a. Cortical dementia is a medical condition characterized by impairment of at least two brain functions, such as memory loss and judgment. Symptoms include forgetfulness, limited social skills, and thinking abilities so impaired that it interferes with daily functioning.

    b. Sensory aphasia is the inability to understand spoken, written or tactile speech symbols that results from damage to the area of the brain concerned with language.

20. Ms. Garner is an individual with disabilities within the meaning of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*

### Ms. Garner Forgets to Pay

21. On June 26, 2020, Ms. Garner wandered out of the Loveland Walmart carrying $13.88 of items she had forgotten to pay for. She had Pepsi, a candy bar, a t-shirt, and some Shout Wipe refills.[1] Walmart employees stopped her and escorted her back inside, where they took the items back. Ms. Garner attempted to hand them her credit card to pay but they refused. Ms. Garner, unable to communicate with them or fully grasp what was going on, then walked out of the store and began walking the short distance back to her home.

---

[1] Theft (value less than $50) is a petty offense in Colorado.

22. Walmart called the Loveland Police to report Ms. Garner. Walmart informed Loveland that Ms. Garner was elderly, small and petite, that she was headed eastbound, and that they had suffered no actual loss because they had retrieved the merchandise from her.

**Officer Hopp Arrives**

23. Officer Hopp responded to the call. He did not talk to anyone at Walmart first. He did not request any additional information from Walmart or dispatch. Instead he just went looking for a petite elderly lady walking eastbound in a neighborhood next to Walmart, as had been described by Walmart employees to dispatch.

24. Officer Hopp promptly found Ms. Garner. She was just a few blocks away from Walmart, walking peaceably in a field alongside Mountain Lion Road, picking wildflowers as she headed to her apartment that was two blocks away.  Her walking pace was slow and unhurried.

25. From twenty yards behind her, Officer Hopp activated his overhead lights while driving behind her, and quietly waited for Ms. Garner to notice and stop for him. She did not notice him, however, and instead continued walking along. He continued driving along behind her at about 2 mph, flashing his overhead lights and waiting for her to stop, which she continued to not appear to notice or understand. This portion of the encounter (Officer Hopp inside his vehicle and Ms. Garner walking in the grass towards her home) was just twenty-two seconds long.

26. Realizing that Ms. Garner was not noticing or understanding what he wanted her to do from his act of driving behind her and flashing his lights,[2] Officer Hopp put his patrol car in park in

---

[2] A hallmark feature of sensory aphasia (common in elderly adults suffering from dementia) is inability or difficulty understanding symbolic communicative words or actions by other people. Where non-disabled adults would likely understand that a police car with flashing lights driving slowly behind them means that the police officer wants them to stop, someone with Ms. Garner's disabilities would infer no such communicative meaning from the officer's actions.

the street, got out to go personally contact her, and notified his dispatch of the same. He did not request back-up. He did not request a mental health unit.

27. Instead, from inside his car, and not within anyone's earshot (let alone that of a disabled elderly woman's 20 yards away) Officer Hopp said in a conversational tone, "Alright, let's stop ma'am."

28. Ms. Garner – unsurprisingly – did not appear to hear him and so continued walking along in the grass towards her home, holding just some wildflowers and her tiny wallet, which contained one credit card. She had literally nothing else with her, besides the clothes on her extremely petite frame.

29. Staring at her back as she walked along, Officer Hopp got out of his car and began striding towards Ms. Garner. He was able to close the distance on her without any difficulty, as she was still walking at a slow, meandering pace. As he did this, he said "I don't think you want to play it this way. Ma'am, police, stop."

30. Ms. Garner did at this moment, for the first time, appear to hear him. She stopped walking, turned towards Hopp, and looked at him quizzically.

31. Officer Hopp, now standing with Ms. Garner, then openly acknowledged the unusual character of Ms. Garner's behavior up to that point. He said, "You don't stop with the lights on?" Ms. Garner, unable to meaningfully communicate with or understand him due to her sensory aphasia and dementia, mumbled some unintelligible sounds in response and put her hands out in a shrugging-type of motion, visibly demonstrating that she was unsure of what he was saying or what he wanted from her.

32. Officer Hopp then – somewhat ridiculously – tried to jog Ms. Garner's memory of what was going on.[3] He said "You just left Walmart…?"

33. Ms. Garner continued to look at him with a blank, confused expression. He then abruptly said, "Do you need to be arrested right now?" Ms. Garner, still appearing to have no idea what Officer Hopp wanted, turned to begin walking again. She did not make it one step, however.

**Officer Hopp Tackles and Handcuffs Ms. Garner**

34. Officer Hopp – who was wearing body armor and was armed with a baton, taser, firearm and a lapel microphone with which he could talk to dispatch and request mental health units or back-up – did not call dispatch or request a mental health unit. He did not waste even one second on calm conversation or explanation. Instead, he immediately leapt out and physically grabbed Ms. Garner's left arm, and violently twisted it behind her back. Then he threw her 80-pound body to the ground and climbed on top of her, still inflicting upon her the painful rear wristlock maneuver he was employing to put her in handcuffs.[4]

---

[3] Any reasonable officer would have discerned from visual observations of Ms. Garner up to this point that there was a high likelihood she suffered from dementia or some kind of mental disability. However Officer Hopp's behavior and comments during this portion of the encounter, particularly when he was trying to jog her memory about where she was coming from, reveal that he also had a subjective belief that Ms. Garner was likely suffering from some kind of mental disability.

[4] Despite the existence of the bodyworn camera footage, Officer Hopp lied repeatedly throughout his written report describing the incident with Ms. Garner. He claimed that when he first got out of his patrol car he identified himself as police and "gave her several lawful orders to stop." In fact, he yelled at her *once* loudly to stop and she did stop and stood awaiting him to walk up. When she turned to walk away, Hopp says he "grabbed onto Garner's arm and gave her several loud, verbal commands to stop." As the video reveals, he did no such thing and instead just immediately chucked her to the ground. He also attempts to describe him throwing her to the ground as "Garner began to violently pull away from me and tried to run away from me" which is easily disproved by the video and also was refuted on scene by the concerned citizen who stopped to record the officers' assault.

35. Ms. Garner, observably having no idea what was going on, and now being tackled, harmed and attacked, began frantically crying out "I'm going home! I'm going home!"

36. "No, no, no," Officer Hopp chuckled in response while leaning into her back with his knees, handcuffing her.

37. The time that elapsed between Ms. Garner stopping and noticing Officer Hopp, and Officer Hopp grabbing and tackling Ms. Garner, was just 8 seconds.

38. What happened during the next minute of Officer Hopp throwing this at-risk and mentally disabled elderly adult around into the dirt and pulling her arms painfully behind her back while she frantically cried out the only thing she knew to say ("I'm going home!!") is difficult to watch and even more difficult to describe. Officer Hopp's bodyworn camera video recording, which has been submitted with this filing as **Plaintiff's Exhibit 1**, is thus incorporated by reference here.

39. After finishing handcuffing Ms. Garner, Officer Hopp, still atop her tiny body, alerted dispatch on his handheld radio in a sing-song tone, "After a short struggle, she has been detained." The timbre of Officer Hopp's voice as he reports this gives the unmistakable impression that a needless officer assault on an elderly disabled woman is just another day at the office for Loveland Police.

40. Officer Hopp falsely claimed in his written report that what he did to Ms. Garner was to "place [her] on the ground in a controlled manner." This is the customary way that Loveland police officers falsely describe and cover up their practice of needlessly and violently taking arrestees to the ground in the process of handcuffing them.

41. Officer Hopp then forcibly lifted the terrified and in-pain Ms. Garner off of the ground and marched her over to his patrol car where he threw her over the hood. She continued to

repeatedly cry out "I'm going home" and look frantically around her, not understanding what was going on or why.

### Officer Jalali Arrives

42. Officer Daria Jalali of the Loveland Police Department then arrived. At a very leisurely pace, she strolled over to the car hood where Officer Hopp had forced the top half of Ms. Garner's body down prone onto the hood. Officer Jalali did not ask any questions about what was going on or why such excessive force was being utilized on this frail, elderly lady. Instead, Officer Jalali put her own hands on Ms. Garner to hold her while Officer Hopp continued pushing painfully upward on Ms. Garner's already-restrained left arm and while also violently touching her all over her body.

43. There was absolutely no need for this continued use of force and actual physical assault upon Ms. Garner. She was handcuffed and harming no one. However Officer Hopp decided to keep performing pain-inducing compliance maneuvers on her so that he could go through her pockets.

44. Ms. Garner, being subjected to increasingly terrible levels of pain by Officer Hopp's assault, turned to Officer Jalali for help and again cried out "I'm going home!!" Officer Jalali – definitely not the help Ms. Garner was looking for – snarled back into Ms. Garner's face in an irritated tone, "QUIT!"

45. Ms. Garner was completely handcuffed and restrained. However, she was so small in size, and still so fraught with panic and terror at the unexplained attacks upon her by the police officers, that she had one handcuffed hand behind her back (the left) and the other handcuffed hand in front of her (the right) holding her wallet. It annoyed Officers Hopp and Jalali that she had not yet visibly bowed down to their authority by going limp with both hands in the typical behind-

the-back position. So while Ms. Garner was in fact fully handcuffed and restrained, Officer Hopp decided he would next deliberately injure Ms. Garner to see if that would result in the complete and unadulterated submission Loveland Police officers believe they are owed and are trained to expect.

46. Accordingly, next, without warning or justification, Officer Hopp took Ms. Garner's entire bent and restrained left arm with both hands and he shoved it violently forward onto the hood of his car. You can see and hear on his video how this fractured and dislocated Ms. Garner's shoulder.

47. Ms. Garner cried "OW!!!!" and began to crumble to the ground in pain.[5] In response, Officer Hopp asked her blithely, "Are you finished?" Ms. Garner, going into shock and still collapsing, had no response. To which Officer Jalali yelled at her in disgust: "*Stand up*! We're not going to hold you!"

---

[5] Officer Hopp described this in his report as Ms. Garner "crumpl[ing] to the ground" and decided that was sufficient justification to again throw her body on the dirt to be searched. He made sure to again use the customary Loveland language to describe this violent act as "plac[ing] her onto the ground."



48. The snapshot above is from Officer Hopp's bodyworn camera and shows a glimpse of what Ms. Garner's arm looked like on her back after Hopp fractured and dislocated it. This is obviously, visibly, not a position that an arm safely attached to a body is ever located.

49. This will be addressed in more detail later in the Complaint but it is worth reiterating here that despite this vantage point of the physical injury that had been done to Ms. Garner's arm, no one at Loveland Police ever obtained medical care or a medical evaluation for Ms. Garner during the several hours following this event before they deposited her at the jail.

50. Still annoyed that Ms. Garner's restrained hands were not both behind her back like larger handcuffed hands usually are, Officer Hopp sighed and announced "alright, let's just go to the ground." He and Officer Jalali then chucked Ms. Garner's 80-pound, injured body onto the ground.

51. Ms. Garner kept her right hand tightly gripped on her little credit-card-sized wallet during all of this.

52. Ms. Garner's children report that as Ms. Garner's dementia and mental condition has deteriorated, one of the items she has become preoccupied with is her credit card. When in a distressed state in particular, one of Ms. Garner's primary fixations involves centering on the belief that people around her are intent on stealing her credit card from her. If someone tries to take her credit card or wallet from her, even momentarily, she becomes frantic and upset.

53. Once on the ground, the next thing that Officer Hopp did was violently wrest from Ms. Garner's clutched hand her wallet containing her credit card, and hand it to Officer Jalali whom he loudly directed to "see what she has." Horror wrote itself across Ms. Garner's face as one of her disability's most distorted terrible fears came true.

54. Officer Jalali then stood towering over Ms. Garner with her wallet in her hand, asking Officer Hopp why he hadn't just "put her in [Hopp's patrol] car." Officer Hopp replied that he wanted to search her first. He began patting Ms. Garner up and down her body as she laid on the ground. Ms. Garner looked up and back at Officer Hopp, clearly in pain and terror, and implored him again, in tears and a soft, pained voice: "I'm going home."

55. In response, Officer Hopp *laughed* at Ms. Garner. "No," he chuckled, "you're not." And then he pushed her restrained and defenseless broken body back down onto her stomach.

56. From the time that Officer Hopp grabbed Ms. Garner at the outset of the encounter to the time he began driving her to the Loveland Police Station, **Ms. Garner repeated "I'm going home" 38 times.**

57. During this entire same period, the only two other statements Ms. Garner was able to utter at all were: "you hurt me," and "I want my credit card."

58. Still, no medical or mental health care, treatment or providers were summoned for Ms. Garner at any point by anyone employed by Loveland Police.

13

**A Concerned Citizen Tries to Help Ms. Garner**

59. Ms. Garner had now been handcuffed for over a minute and was prone on the ground scraped up, bleeding, and covered in dirt, injured, and despondent. Her left humeral neck had been fractured and her shoulder displaced. A concerned citizen driving down the street had witnessed this whole encounter and stopped his car to get out and film the officers.

60. Noticing the citizen, and realizing how bad they looked, the officers decided they would try and cram Ms. Garner's injured body out of sight, into the back of Officer Jalali's patrol car.

61. As they began to do that, and while Ms. Garner continued to frantically cry out, "I'm going home!" the concerned citizen who had stopped to film them yelled, "Do you have to use that much aggression??" Officer Hopp yelled back at him: "What? This is none of your business! Get out of here!" and he rudely gestured at him to leave.

62. The concerned citizen did not go away. So Officer Hopp left Ms. Garner with Officer Jalali and marched over to the citizen and demanded to know what he (the citizen) was doing. The citizen told Hopp that he had watched the whole time and seen him throw around and beat up "that little kid."

63. Officer Hopp sneered at the citizen, told him he didn't know what he was talking about, as it was not a kid, but an old lady. The citizen said he wanted to make a report on Hopp and demanded to know the name of his sergeant. Officer Hopp told him that his sergeant was Sergeant Metzler and that he could call him anytime.

64. Officer Hopp was observably confident throughout this incident that his supervisor, Sergeant Metzler, would approve of everything he and Jalali had done to Ms. Garner. That confidence, it would turn out, was very well-placed.

65. The citizen continued to express concern about what he had witnessed. He said "She was just walking, and I saw you, how you threw her." Officer Hopp replied "She just stole from Walmart and refused to stop, refused to listen to lawful orders, and she fought me. This is what happens when you fight the police."

66. Like most people who are being gaslit, the citizen then looked confused. He said, "Well… That's not how I saw it from over there." He tried to say more but then Officer Hopp cut him off, interjecting, "Well, you didn't see the whole situation, that's the thing." The citizen tried to explain that he *had* seen the whole event, saying "Yeah, I know but it's like-" and Hopp again cut him off, abruptly demanding, "Knowing the situation do you feel differently now?"

67. The concerned citizen looked taken aback at how quickly Hopp had flipped this encounter into one in which he, the citizen, despite having witnessed obvious police brutality, was now the accused and on the defense. The citizen tried again to explain what he had seen, "But seeing it from here, I just see this [lady] just walking-" and again Hopp forcibly interrupted. "Yeah, I get it, I get that but so when I went to go grab her, and talk to her, *she started running,* leaving, pulling away and *trying to fight me.*"

68. Karen Garner, of course, never did *any* "running." She also never "fought" Hopp.

69. The citizen knew what he had seen, and that he had recorded it. Recalling this fact, he did not accept Officer Hopp's lie about Ms. Garner "running."

70. The citizen said "I didn't see her running-" but before he could say another word, Officer Hopp again quickly cut him off, chastising him: "Before you go to a snap judgment, you gotta get all the facts."

71. The citizen, not so easily fooled as Hopp was perhaps used to, looked at the video on his phone, and then looked back at Hopp. Confident in what he knew he had seen, he pointed to everything

he had seen, and said back to Hopp: "Right here, I see she wasn't running. I can see she was walking right here."

72. Hopp quickly terminated the encounter and said he had to go back to Ms. Garner and then literally ran away from the citizen.

73. Back at the patrol car, Ms. Garner remained as terrified and distressed as ever, continuing to cry "I'm going home!"

74. Officer Hopp and Officer Jalali then together pulled Ms. Garner out of the car and chucked her restrained body onto the ground again (once again described in Hopp's report as "plac[ing] her on the ground"), where they climbed on top of her and tied a hobble around her legs. She continued crying for home. She was bleeding from the nose, forehead, and wrist, all over herself.

### Sergeant Metzler Joins In

75. Sergeant Phil Metzler was both Officer Hopp's and Officer Jalali's supervising officer. Outside of his own duties as an officer, he had duties to train and supervise these two officers.

76. Sergeant Metzler knew from the dispatch notes that Officer Hopp had been responding to a shoplifting call regarding an elderly lady and that within seconds Officer Hopp had found the lady and taken her down.

77. Knowing this, Sergeant Metzler arrived on scene and leisurely strolled up to Officers Jalali and Hopp who were kneeling atop Ms. Garner's hog-tied, injured and bleeding body. Officer Hopp said: "Can you help get her in the car?" And Sergeant Metzler said "sure." Then all three of them lifted her body, with Sergeant Metzler and Officer Jalali lifting much of Ms. Garner's body weight from her dislocated and fractured left shoulder. Ms. Garner can be observed on video not moving at all during this time.

78. Officer Hopp then fumbled his side of Ms. Garner's arm and the officers dropped her hog-tied body to the ground where she hit it face first, unable to use her handcuffed hands to protect herself. The three officers then lifted her again and carried her to the patrol car where they slid her body into the backseat. As they closed her inside, she began reaching out her handcuffed right hand for her wallet, crying "I want my credit card, I want my credit card!"

79. Officer Hopp attached Ms. Garner's leg hobble to the vehicle so she could not move her legs or torso and shut the door on her.

80. Outside the car, Sergeant Metzler, asked: "So this was a… shoplifting?"

81. Officer Hopp told Metzler that yes, it was, and this exchange occurred:

HOPP:           Yep, so I went up, I found her-

METZLER:      Did you catch her here walking on foot?

HOPP:           Yeah, she was walking right here, I put my lights on, and she kept walking. I said "police stop," she stopped and looked at me.

82. At this moment of the exchange, you can see Sergeant Metzler deactivate his bodyworn camera.

83. Hopp was not quite so experienced in manipulation of police recording devices, and so he left his bodyworn camera recording on, and continued, "[She] kept going, saying no I'm going home, so I went to grab her, she started pulling away from me and stuff like that so, I was by myself so I went to the ground, we struggled, and rolled for a little bit, um-"

84. At this point Sergeant Metzler interjected with laughter, and said, "Ha, I can see that!"

85. Hopp smiled and laughed as well, and continued, "Yeah, and then I got her detained, [Jalali] showed up while I had her against the car because I couldn't get her in the car, because mine was locked."

86. Sergeant Metzler nodded and wondered aloud what was wrong with Ms. Garner. Hopp, indifferent as ever, responded, "I have no idea, she wouldn't talk to me."

87. Sergeant Metzler then shrugged and said, "Alright. Take her down to the station and go from there."

88. Sergeant Metzler then went to deal with the concerned citizen, who was still very displeased with the attack he had witnessed on Ms. Garner. The concerned citizen told Metzler the excessive force he had seen and Sergeant Metzler began gaslighting the citizen himself, telling him that what he thought he saw is not what he saw.

89. When the citizen did not kowtow to Sergeant Metzler's bullying, Sergeant Metzler next began accusing the citizen of possible arrestable wrongdoing for "inserting yourself into the situation." Metzler pointed his finger into the citizen's face aggressively and yelled at him in the process of telling him he had no idea what he was talking about and that all the force used by Hopp and Jalali was justified.

90. Despite Loveland Police policy (and Colorado law) requiring that officers interacting with the public wear bodyworn camera and record, Sergeant Metzler made certain that his camera did not record any of this.

91. Officers Hopp and Jalali, standing 15 yards off together, just watching Metzler intimidate and bully the concerned citizen, laughed and commented to one another, "Good ol' Metzler."

92. Also during this time, with Ms. Garner shut inside the patrol car, the two officers took turns opening the door and demanding information from her. She continued to cry about her credit card, say she was hurt and that she was going home. She could not even provide her own date of birth. Ms. Garner continued to engage in observably bizarre behavior like scratching at door compartments and mumbling incomprehensibly.

93. Still, not one of the defendant officers sought medical care or a mental health professional for Ms. Garner at any point.

94. Also during this, yet another Loveland police officer, Officer Copello, sped to the scene with his lights and sirens on. For over 5 straight minutes, Officer Copello dangerously blasted through red lights and at times drove over 60 miles per hour, well over the posted speed limits, throughout the streets of Loveland. Upon arriving on scene, he got out of his car, sauntered up with zero urgency to the three officers standing around there (Metzler, Hopp and Jalali) and asked if there was anything left to do. He was told to just "get the story from Walmart."

**Loveland Police Failure to Train**

95. The Alzheimer's Association has a 5-page pamphlet called "Safe Return" that they send to law enforcement agencies nationwide which contains some of the most basic principles and items for police to keep in mind when dealing with an elderly person who may have dementia. Their "Quick Response Tips" begins as follows:

> "If you encounter someone showing signs of Alzheimer's disease, the person may seem uncooperative with no memory of what happened, despite easily verifiable events. Because Alzheimer's disease affects the part of the brain where memory is stored, the individual may be unable to answer your questions or understand the seriousness of the incident.
>
> When you encounter someone with dementia:  …
>
> • Avoid restraints; confinement may trigger agitation, which may compound confusion and disorientation. Restrains should be used only as a last resort for the safety of the individual or others.
> • Avoid confrontation.
> • Maintain a calm environment, devoid of chaos and excessive stimuli; reduce radio volume, keep squelch down and avoid use of sirens."

96. The "Safe Return" pamphlet also includes this commonsense information:

> "**Common encounters with people with Alzheimer's**. Wandering is just one situation you are likely to encounter with an individual with Alzheimer's disease. Many behaviors associated

19

with dementia tend to increase a person's chance of interacting with law enforcement. Because these individuals are often unable to explain their unusual behavior, their actions are more easily misunderstood.

*Shoplifting*. Memory impairment can hinder the ability to remember to pay for items. People with dementia may walk out of stores without paying, unaware of any wrongdoing. Confronting the person is not recommended. Instead, ease the person out of the situation, and try to resolve the matter with the store manager and caregiver."

97. The City of Loveland claims that it has trained and educated its officers on how to interact with those who are disabled or have mental illness. Loveland has a policy titled "Dealing with the Mentally Ill" which admits that "[m]ental illnesses and related disorders commonly encountered by law enforcement include . . . Neurocognitive disorders (delirium, dementia, Alzheimer's disease)." The policy directs that "[w]hen encountering a person exhibiting signs or symptoms that may indicate the person is suffering from a mental illness, enforcement personnel should attempt to establish a sincere relationship with the individual, while maintaining the safety and security of all persons involved throughout the encounter."

98. This Loveland policy then lists a number of "general de-escalation strategies" which it takes special time to emphasize in the policy are merely "guidelines" that are "suggestions" for interacting with persons suspected of having mental illness.

99. Despite the fact that everything about Ms. Garner was a hallmark of a "common encounter with people with Alzheimer's," Officers Hopp and Jalali were trained by the Loveland Police Department that the second someone – anyone – didn't comply with their demands, they could arrest them and in the process of arresting them, they could use whatever force they wanted to do so.

100.    In other words, and despite what is written in Loveland's actual policies for policing, the custom and practice at Loveland Police upon perceiving any hint of possible noncompliance

with an officer's command – regardless of circumstance, alternatives, written policies, likely disabilities, or basic humanity – is to violently arrest the person utilizing excessive force.

101.    Loveland Police have a custom and practice of requiring no proportion be attempted or maintained whatsoever by its officers between the amount of force used on citizens and the amount of force actually required. In fact, the more disproportionate the force used, the more the officers appear to relish in and joke with one another regarding it.

102.    The other hallmark of this custom and practice at Loveland Police is their systematic reliance on abuse of Colorado's obstruction and resisting arrest statutes to later falsely justify and cover up their excessive uses of force. In short, the custom is as follows:

    a.   If a citizen does not immediately kowtow to a Loveland Police officer's show of authority;

    b.   The officer will use aggressive and dangerous assaults and attacks to put the citizen into handcuffs (this always includes the officer violently "placing" the person on the ground in the process); and

    c.   After the event, the officer will falsely charge the citizen with obstruction and/or resisting arrest in an effort to cover up and justify both the wrongful arrest and the excessive use of force.

103.    This reality is corroborated by what their supervising officer, Sergeant Metzler, said in his exchange with Hopp after hearing all that had happened with Ms. Garner:

METZLER:        Let's get her down to the station.

HOPP:             Ok, we don't need to wait for follow-up?

METZLER:        Uh, no, we can see what, I mean- we know, we know, she, what's it [dispatch call notes] say?

| HOPP: | That she stole some stuff, and they caught her before she left, and got it back, and she ran out. |
|---|---|
| METZLER: | And then you contacted her for that, and she obstructed and resisted. So. We're good either way. Either way, she's going. **And if they decide not to prosecute, I don't care**. |

104. This reality is also corroborated by this exchange that Sergeant Metzler and Officer Jalali had shortly after Metzler's arrival on scene:

| METZLER: | Is that blood on you…. Hers? |
|---|---|
| JALALI: | It's hers. |
| METZLER: | So you're- |
| JALALI: | *(smiling)* A little bloody, a little muddy. You know how it goes. |

105. Multiple bodyworn camera videos from the past two years where officers have forgotten to mute their cameras also confirm that it is custom and practice at Loveland police to overcharge obstruction and resisting offenses to cover up excessive uses of force.

106. Reports and information obtained through CORA requests and case discovery reveal that Loveland Police charge citizens with obstruction and resisting arrest offenses at an extraordinarily higher rate than other police departments in Colorado.

107. Upon information and belief, Loveland Police obstruction and resisting arrest cases are dismissed by prosecutors at an extraordinarily higher rate than those same charges filed by other Larimer County police departments.

108. On September 22, 2019, Loveland police officers beat up, arrested and falsely charged Preston Sowl for the non-existent crime of "not talking to them," resulting in Mr. Sowl's arm being dislocated. Multiple Loveland police officers and supervisors on scene assisted in this

misconduct and its subsequent cover-up. The Larimer District Attorney's office dismissed the falsely filed resisting arrest and obstruction charges Loveland filed against Mr. Sowl pursuant to this custom and practice at their agency.

109.     Upon information and belief, Loveland Police provide no training whatsoever regarding how to put a subject into handcuffs without needlessly injuring them. As a result, Loveland Police officers dislocate the shoulders of citizens they put under arrest at an extraordinarily higher rate than other police departments.

110.     In addition to the false claims made by Loveland's written policies, Chief Bob Ticer of the Loveland Police Department also regularly proclaims that all Loveland officers are trained in recognizing mental health and related disorders, and are trained in de-escalation techniques. But in reality, Loveland officers receive little or no training on interacting with people with disabilities or mental illness, how to approach such people, how to de-escalate with such individuals, how to keep those individuals safe, or when to seek medical attention for those individuals.

**Transport**

111.     Officer Hopp and Jalali then chatted with each other about Ms. Garner. Officer Hopp joked that he never really needed any help in detaining her because "she's like… 20 pounds."

112.     Officer Jalali then drove Ms. Garner to the police station. On the drive there, Ms. Garner mumbled incoherent sounds that Jalali could not understand. Still, no one called for medical for Ms. Garner.

113.     Upon arriving at the police station, Officer Hopp commented to another officer that came out to assist in removing her hobbled body from the back of his patrol car: "She's a frail little thing, but she's riley."

114.   Officer Hopp and Officer Jalali then got Ms. Garner out of the back and lifted her up with complete disregard of her fractured and dislocated left shoulder. With a new officer holding her hobbled legs, Officer Hopp holding Ms. Garner's right arm, and Officer Jalali holding her left arm, they lifted her body up, holding it horizontally, with Officer Jalali literally using Ms. Garner's broken and dislocated arm for this lifting purpose. Very unsurprisingly, Ms. Garner cried out in more pain. They ignored her and continued carrying her using the broken arm.

**Failure to Provide Medical Care**

115.   The officers next deposited Ms. Garner – still visibly, observably injured and suffering – on a bench in a cell at the Loveland Police station and tied her to it. Then they handcuffed her handcuffed hands to the bench as well. She continued to cry out in pain.

116.   Officers Hopp and Jalali then deactivated their bodyworn cameras so that they could work together to coordinate their written reports regarding what had happened without anyone later being able to hear it. Meanwhile, no one called for any kind of medical care or mental health assistance for the handcuffed, crying and restrained Ms. Garner in the cell ten feet away from them.

117.   From time to time over the next two hours, the officers would pop into Ms. Garner's cell to ask her a question. Some of those times, they would re-activate their bodyworn cameras. Over those two hours, Ms. Garner repeatedly made the following complaints to Loveland police officers at the station:

- "They hurt my wrist"

- "Can you take them off?" (the handcuffs)

- "They hurt my wrist"

- "They hurt my shoulders" (note: this statement was just *recorded* being said by Ms. Garner over 10 times)

- "It hurts my shoulders"

- "Hurts, hurts, my shoulder"

118.   At one point, the officers went in to take photographs of Ms. Garner. Ms. Garner again complained: "It hurts my shoulder." Officer Hopp responded: "I know."

119.   Another officer (Officer Tyler Blackett) at the Loveland Police station asked Hopp while they were doing paperwork if Hopp suspected Ms. Garner was on alcohol or drugs. Hopp blithely responded that Ms. Garner was "[on] drugs or just losing it."

120.   Officer Blackett also wrote in his report regarding his time spent with Ms. Garner at the station and transporting her to the jail that she seemed "confused and unaware of what was happening." Still, no one at Loveland Police sought any kind of medical or mental health care for Ms. Garner.

121.   Sergeant Metzler oversaw and supervised what the defendant officers did at the station and both personally directed it as well as approved of it while it was ongoing.

122.   Keeping someone who has a fractured and dislocated shoulder in handcuffs for hours on end is extremely painful. Loveland Police did this to Ms. Garner pursuant to Sergeant Metzler's express direction. They also denied her access to medical care during this time pursuant to Sergeant Metzler's express direction.

123.   Loveland Police then dropped Ms. Garner off at the Larimer County jail. They did not provide jail deputies with any explanation or mention of the fact that Ms. Garner had complained of pain, been involved in a severe use of force incident, was obviously mentally ill, and clearly needed medical evaluation before being further isolated in a cell.

124.    In fact, they did the very opposite: They indicated on Ms. Garner's transport paperwork

provided to the jail (and relied upon by the jail) that she did not have ANY injuries:



125.    They did this knowing that it would result in Ms. Garner continuing to be denied necessary

medical attention and treatment, and would foreseeably result in her suffering an exacerbated

shoulder injury and more needless pain and suffering.

**Aftermath**

126.    As a result of the ignorance of Ms. Garner's conditions that had been inflicted upon them

by the Loveland Police officers, the Larimer jail deputies put the injured, terrified and confused

Ms. Garner into a cell and left her there for another 2 and a half hours. Eventually a deputy at

the jail realized Ms. Garner was grievously injured and she was transported to the hospital.

127.    For the 6 hours that Ms. Garner was kept in custody by Loveland and the jail, despite many

jokes made about her being disabled and mentally unfit, no one attempted to locate Ms.

Garner's caregiver, console or help her, de-escalate her, or alert her loved ones to her terrible

situation.

128.    Ms. Garner was first attacked and injured by Officers Hopp and Jalali at 4:36 pm that day.

She received zero medical care or attention for over six hours until she was finally released to

the Poudre Valley Hospital emergency room by the jail at 10:38 pm that night.

129.    At the hospital, Ms. Garner was diagnosed with a fractured humerus, a dislocated shoulder

and a sprained wrist. She was covered in scrapes and bruises. Hospital staff (but not anyone at

Loveland Police) were able – with some basic effort in less than 20 minutes – to locate a phone

number for Ms. Garner's daughter Allisa Swartz, who then raced to the hospital.

130.    Ms. Swartz, in horror, then laid eyes on the damage that had been inflicted upon her mother

by Loveland Police.

131.    By then, Ms. Garner's left arm looked like this:



132.    Ms. Garner's wrist looked like this:



133.    Loveland Police officers (including Hopp and Jalali) had made sure to take some

photographs of Ms. Garner's most superficial injuries (some of the scrapes) while making

certain to not document the more serious injuries to her wrist and shoulder.

134.    Loveland Police did not even pull up her long sleeves when photographing her wrists,

ensuring that this was the only record they made of her wrist injuries:



135.    Ms. Garner's left shoulder remained obviously dislocated throughout her time with the Loveland police. To assist in falsely claiming later that they didn't know of her injury, Officers Hopp and Jalali *draped the hood of Ms. Garner's sweatshirt onto and over her broken and dislocated left shoulder* so that the horrifying bend of her broken arm wouldn't appear quite as noticeable. Then they took this picture of her:



136.    Ms. Garner complained of her pain and injury the entire time she was at the Loveland Police department. Despite all of the foregoing, and despite the obvious injury apparent in the picture above, the officers knowingly denied her any medical care and kept her handcuffed, experiencing more needless pain and suffering.

**Custom/Practice of Ignoring Loveland Written Policies**

137.    Loveland written policy 11.03 ("Transportation of Arrestees") states:

"If an arrestee becomes noticeably sick or affected by an injury, the transporting officer shall notify the on-duty supervisor. The supervisor shall determine whether the arrestee is to be transported to a medical facility or taken to the Department booking area pending medical treatment. If the sickness or injuries are debilitating, the officer or supervisor should request an ambulance come to the scene to assess the arrestee's condition."

138.    Ms. Garner was noticeably affected by an injury on-scene and the on-duty supervisor (Sergeant Metzler) directed that she not receive medical treatment and instead be taken to the station and held in a booking cell without access to care. All three defendant officers knowingly violated Loveland's written policy regarding caring for and transporting arrestees in their custody and control. They did this because such was the custom and practice at Loveland police department, in order to minimize documentation of complaints against their officers.

139.    Loveland Police written policy 11.04 states:

"Any time a person has visible injuries or complains of being injured as a result of force used against him/her by an officer, the officer must take appropriate actions to provide medical care for the injured person. The provisions may include first aid, requesting emergency medical services, and/or arranging for other transportation to a hospital or emergency medical facility."

140.    Defendant officers Metzler, Hopp and Jalali knowingly and deliberately violated this policy with deliberate indifference to Ms. Garner's health and safety, causing her more terror, injury, pain and suffering.

141.    This same policy (Loveland Police policy 11.04) also states:

"The officer who uses force must ensure that the on-duty supervisor is notified without undue delay. The supervisor must ensure:
- Appropriate medical attention is provided to all affected persons
- Photographs are taken to document injuries or the lack of injuries
- Notifications are made to any holding facility the subject is transferred to
- Necessary reports are completed prior to the end of the officer's shift unless the supervisor approves a delay."

31

142.    Sergeant Metzler was the on-duty supervisor with the responsibility to ensure that this policy was followed and Ms. Garner received medical attention for her injuries. He did the opposite. He deactivated his bodyworn camera, did not create a report, authorized the other officers' continued deprivation of critical medical care to Ms. Garner, and directed that the Larimer County jail not be notified of Ms. Garner's injuries requiring medical attention.

143.    Because Ms. Garner was plainly mentally ill and unable to advocate for herself, Defendant Metzler knew that delaying her access to medical care would increase the likelihood that Loveland Police could claim the injuries she had suffered at their hands had occurred somewhere else.

144.    More than 1 in 7 people of Ms. Garner's age suffer from dementia or Alzheimer's disease.[6] It is long and well-established as one of the most foreseeable and common mental illnesses afflicting elderly citizens, and the most common behaviors associated therewith were exactly the behaviors seen in Ms. Garner on the day she was attacked, injured, isolated, and imprisoned by Loveland police officers.

145.    Even Loveland Police's own written policy (Policy Number 11.35) acknowledges that dementia and Alzheimer's are "mental illnesses and related disorders commonly encountered by law enforcement" and that Loveland officers must therefore be aware of the "commonly encountered behaviors" associated therewith.

146.    Upon information and belief, however, Loveland Police officers have received no actual training regarding how to safely interact with disabled citizens, elderly citizens, and citizens

---

[6] Plassman B.L. et al, "Prevalence of Dementia in the United States: The Aging, Demographics and Memory Study," *Neuroepidemiology* 29: 125-132 (2007).

suffering from dementia. If they had received such basic training, and if they were the type of agency that valued following such training and policies, this event never would have occurred.

147.    The City of Loveland is responsible for effectively training its officers regarding disabled and elderly adults, but failed to do so.

148.    The City of Loveland states that its officers are trained in recognizing mental health and related disorders, and trained in de-escalation techniques. In reality, Loveland officers receive little to no training on interacting with people with disabilities, how to approach citizens with disabilities, how to de-escalate with these citizens, how to keep these citizens safe, or when to seek medical attention for such citizens.

149.    Whatever training Loveland officers do receive is ineffective and inadequate and leaves officers with clear gaps in their knowledge of how to interact with citizens with disabilities.

150.    The defendant officers involved in this incident did not have appropriate training. If they did have appropriate training, their behavior as seen on video demonstrates that they deliberately disregarded that training pursuant to a custom, pattern or practice at Loveland of doing so.

151.    No officer was disciplined due to this incident, and in fact, the officers complimented each other on their performance.

152.    The Loveland Police Department has a pattern and practice of its officers mishandling situations involving citizens with disabilities.

153.    They have a pattern and practice of disproportionately and needlessly putting citizens with disabilities into restraints, secluding them, and injuring them.

154.    It is the custom and practice at Loveland Police to throw people to the ground in the process of arresting them if they are not immediately submissive and responsive to the officer's whims.

33

Similar events have occurred with other officers at Loveland Police in August 2018, September 2019, and just a week prior to this event, in June 2020. The three aforementioned incidents are just those that Plaintiff's counsel has learned of by coincidence or chance.

155.    Upon information and belief, discovery will reveal plenty more, as Loveland is literally infamous[7] for denying (using self-invented "loopholes") valid Open Records Act requests regarding such use of force, internal investigations, and injury records otherwise.

156.    Loveland Police Department has a pattern and policy of police brutality, failures to de-escalate, and using excessive force on civilians.

157.    Loveland Police policy number 11.35 states:

"**General De-Escalation Strategies**. When encountering a person exhibiting signs or symptoms that may indicate the person is suffering from a mental illness, enforcement personnel should attempt to establish a sincere relationship with the individual, while maintaining the safety and security of all persons involved throughout the encounter. The following guidelines are suggestions for interacting with persons suspected of having mental illness:

- Maintain an appropriate reactionary gap between yourself and the subject
- Model calm behavior and non-threatening body language
- Re-assure that you are there to help
- Minimize distractions and disruptive people
- Use simple commands
- Announce actions before initiating them, except where it may jeopardize departmental personnel or others
- Expect possible delayed responses due to confusion and fear
- Do not ridicule or tease the person"

---

[7] "Colorado law's 'loopholes' keep unknown number of police internal investigations secret," *The Coloradoan* (Sept. 18, 2020), accessible at: https://www.coloradoan.com/story/news/2020/09/18/colorado-police-internal-affairs-laws-loopholes-deny-records-public-record/3254632001/

"The Coloradoan's January request for internal affairs investigation records completed by the Loveland Police Department resulted in five months of deliberation, multiple denials, and a cost estimate topping $2,000. Loveland declined to release records responsive to the Coloradoan's request until receiving a letter from [an attorney], raising concerns about how members of the public would be able to obtain the documents without substantial resources."

158.   Officers Hopp and Jalali followed exactly none of the above listed "guidelines" for interacting with Ms. Garner. Ms. Garner presented no threat of harm to anyone – officer or otherwise – and Officers Hopp and Jalali nevertheless made certain to needlessly harm her within seconds of their initial contact.

159.   This woefully inadequate written policy for how officers are to handle the mentally ill (it is less than 4 pages long – total) also states that officers are to "notify booking personnel at criminal detention facilities of mental health concerns of an arrestee." Loveland Police officers Hopp, Jalali and Metzler made plenty of jokes about Ms. Garner's mental health concerns and then deliberately violated this policy when they had her deposited at the Larimer County jail labeled "uncooperative" and uninjured, ensuring she would go longer without critical medical treatment and mental health assistance.

160.   The City of Loveland's customs, patterns and practices and their lack of adequate and effective training of their officers were the moving forces behind the injuries to Ms. Garner and the violations of her rights.

161.   Plaintiff experienced physical pain, trauma and suffering as a result of the Defendants' unlawful conduct and violations of her civil rights.

162.   Plaintiff also suffered impairment of reputation, personal humiliation, mental anguish, and suffering by virtue of the unlawful actions of these Defendants as set forth herein, for which she is entitled to compensation.

163.   In the months that followed this incident, Ms. Garner constantly complained of physical pain in her shoulder, arm and wrist. When caregivers would assist Ms. Garner getting in and out of the sling she had to wear and assist her with using the shower and bathroom, getting dressed, etc., as well, Ms. Garner would anxiously and frantically repeat "why did they do that

to me? Why did they do that to me?" and point to her arm. She still, nearly a year later, gets on fixated cycles of asking "why did they do that to me" and pointing to her injured left shoulder.

164.    The injuries to Ms. Garner's left arm have never fully healed and as a result she has since this incident been unable to use her left arm functionally to shower, dress, or put on make-up.

165.    Immediately following this incident and permanently since, Ms. Garner began having extreme trouble sleeping, became more withdrawn, and began isolating in her bedroom very early in the day and refusing to come out. Her quality of life was already difficult due to her disability and dementia but the trauma inflicted by the Defendants on June 26, 2020 has since completely devastated it.

166.    All of the Defendants' actions as described herein were taken under color of state law.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### *42 U.S.C. § 1983 – 4th Amendment Violation – Excessive Force*
(against Defendants Hopp and Jalali)

167.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

168.    When Defendant Hopp suddenly and without warning physically attacked Ms. Garner by – among other things – grabbing and twisting her arm, slamming her to the ground, climbing on top of her back, and violently handcuffing her, as set forth in the paragraphs above, this was an assault upon Ms. Garner's person, employing excessive force, in violation of the Fourth Amendment.

169.    No officer (besides those employed at Loveland) would consider Defendant Hopp's sudden

and unannounced deployment of painful force and excessive aggression upon Ms. Garner to

have been reasonable or justified under the circumstances.

170.    Loveland written policy 1.03 states regarding use of force:

"A sworn employee will never use unnecessary force or violence and will use only such force
in the discharge of duty as is reasonable and appropriate in each circumstance. Force should
be used only when negotiation and persuasion have been found to be inappropriate or
ineffective. While the use of force is occasionally unavoidable, every law enforcement
employee will refrain from applying the unnecessary infliction of pain or suffering and will
never engage in cruel, degrading, or inhuman treatment of any person."

171.    Defendant Hopp attempted neither negotiation nor persuasion in the mere 8 seconds of

contact he had with Ms. Garner before throwing her frail body to the ground and violently

handcuffing her.

172.    Defendant Hopp's vigorous upward push upon Ms. Garner's handcuffed left arm while she

was on the hood of the patrol car was the literal definition of "the unnecessary infliction of

pain" and "cruel, degrading or inhuman treatment of any person." This violent maneuver,

endorsed and trained by no self-respecting law enforcement agency anywhere due to its

obvious likelihood of causing serious pain and physical injury (dislocation), was used on Ms.

Garner for the purpose of injuring her and showing her that Defendants Hopp and Jalali were

"in charge." This sad reality is further cemented by Hopp's callous comment to Ms. Garner

after breaking her arm of: "Are you finished?"

173.    Defendant Jalali had both the duty and ample opportunity to intervene to stop Officer

Hopp's ongoing violence upon Ms. Garner but chose instead to materially assist Hopp in its

continuation and cover-up by holding Ms. Garner's other side down while he broke her arm

and joining him in throwing Ms. Garner's handcuffed body back onto the ground after that arm was broken.

174.    Defendant Jalali personally continued the excessive force violations begun by Defendant Hopp when she held Ms. Garner down on the hood of the car while Officer Hopp ripped Ms. Garner's left handcuffed arm upwards, dislocating and fracturing her shoulder.

175.    Defendants Hopp and Jalali used excessive force in seizing Ms. Garner, handcuffing her unduly aggressively, breaking her arm and dislocating her shoulder, hog-tying her, and then forcing her to remain handcuffed and restrained for an excessively lengthy period of time.

176.    The Fourth Amendment forbids unreasonable seizures, which includes seizures carried out with excessive force, like this one.

177.    The Defendants unreasonably and unconstitutionally seized Ms. Garner and used excessive force in light of the totality of the circumstances, including but not limited to:

    a.   Ms. Garner had not engaged in serious criminal activity;

    b.   Ms. Garner posed no physical threat to anyone, anywhere;

    c.   Ms. Garner was visibly elderly, frail and tiny;

    d.   Ms. Garner was not attempting to flee or escape anyone but instead was meandering through a field picking wildflowers;

    e.   Ms. Garner's age, size and the likely disabilities associated with her age;

    f.   The communicative problems immediately observed with Ms. Garner upon initial contact suggesting likely dementia and/or other mental disability;

    g.   The failure of Officer Hopp to appropriately approach and handle a woman of Ms. Garner's age, size and with her disabilities; and

h.   Officer Hopp's aggressive, violent, and threatening actions that prompted Ms. Garner to panic and fear for her life.

178.   Ms. Garner's right to be free from unreasonable seizure and excessive force as described herein was clearly established at the time the Defendant officers Hopp, Jalali and Metzler attacked her, handcuffed her, broke her arm, hog-tied her, and then kept her in isolation away from medical care in pain and handcuffs for six hours.

179.   The Loveland Police Department and their officers often interact with people who are elderly, people who have disabilities, or people like Ms. Garner who are both, and thus the circumstances constituted a usual and recurring situation.

180.   Defendants Hopp and Jalali effected their assaults and injuries to Ms. Garner, and Defendant Metzler both approved of and directed the continuation of those assaults and injuries, with deliberate indifference to her rights under the Fourth Amendment to the U.S. Constitution.

181.   Defendants' sudden seizure and violent extended assault upon Ms. Garner caused her to experience great physical pain, injury, and terror. The experience of this event caused and continues to cause Ms. Garner trauma and emotional distress, along with lasting physical injuries.

**SECOND CLAIM FOR RELIEF**
*42 U.S.C. § 1983 – Fourth Amendment – Deliberate Indifference to Medical Need/Excessive Force/Failure to Provide Medical Care*
(against Defendants Metzler, Hopp and Jalali)

182.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

183.   Ms. Garner needed medical care following the injuries inflicted upon her by the defendant officers. Her need for medical treatment was visibly apparent and objectively obvious.

184.   The defendant officers were subjectively aware of Ms. Garner's injuries requiring medical treatment, as evidenced by, inter alia:

- Ms. Garner telling Officer Hopp that her shoulder hurt at the police station and Hopp replying "I know"

- Ms. Garner's repeated statements regarding her shoulder being injured;

- The concealment effort made by the officers in draping Ms. Garner's hood over her dislocated shoulder prior to taking her photograph;

- The fact of Ms. Garner crying out in pain every time her left side was touched after the officers broke that arm;

- What common sense and life experience tells us Officer Hopp's tone and comment meant when he inflicted the acute injury to Ms. Garner's shoulder on the patrol car and *then* asked her: "Are you finished?"

185.   Keeping Ms. Garner in handcuffs, in isolation, and without access to critical medical treatment exacerbated both Ms. Garner's physical injuries and emotional trauma.

186.   The decision made by Metzler and executed by Hopp and Jalali to not inform the Larimer County jail of Ms. Garner's serious injuries quite foreseeably ensured (particularly given her mental disabilities and inability to communicate or advocate for herself) that she would continue to be deprived of medical treatment once transported to the jail and left in a cell.

187.   The Larimer County jail relies on other agencies following written policies that require them to notify the jail of any possible injuries for transported arrestees. The jail naturally and foreseeably assumes that if an arrestee has been involved in a use of force incident with

possible injuries, the Loveland Police will include that information in the booking information that accompanies the transferred arrestee, so that proper medical notice, attention and care can be provided.

188.    Defendant officers violated this policy, keeping the jail deliberately ignorant of Ms. Garner's injuries, which needlessly caused Ms. Garner more injury, more trauma, and more pain and suffering. Defendant officers knowingly and deliberately ignored Ms. Garner's serious medical conditions, and Ms. Garner also repeatedly alerted them to the fact that she was in severe pain, which they also ignored.

189.    As a proximate result of the Defendant officers' deliberate indifference to her serious medical needs, Ms. Garner experienced six hours of needless additional pain and suffering requiring treatment with analgesics and a sling. She experienced heightened and more severe physical pain and trauma along with worsened physical injury, by the defendants keeping her painfully restrained in handcuffs after they had broken and dislocated her shoulder.

190.    Defendant Metzler knew about Ms. Garner's situation, directed that she be denied medical care in violation of Loveland policy, and directed that she be transported to the jail without medical care or treatment. Defendants Hopp and Jalali knew of Ms. Garner's obvious medical needs and elected to ignore them out of deliberate indifference and pursuant to Defendant Metzler's direction.

191.    No officer would consider the Defendants' keeping the bleeding, broken, and disabled Ms. Garner in isolation, without access to medical treatment or mental health assistance, while complaining of multiple physical injuries, to have been reasonable or justified under the circumstances. There is absolutely no justification for the Defendants' decision to deprive Ms. Garner of even momentary access to medical care for over six hours.

192.    Defendants deprived Ms. Garner of medical treatment with deliberate indifference to her rights under the Fourth Amendment to the U.S. Constitution, and caused her needless additional trauma, pain, exacerbated injury, anguish, and suffering.

### THIRD CLAIM FOR RELIEF
*42 U.S.C. § 12101-12213 – Violations of Title II of Americans With Disabilities Act*
(against Defendants Loveland, Metzler, Hopp and Jalali)

193.    All preceding paragraphs of this Complaint are incorporated here for purposes of this Claim.

194.    Title II of the ADA prohibits public entities from discrimination on the basis of a disability. 42 U.S.C. § 121311(1)(B)). Title II of the ADA requires reasonable accommodation during arrest for people with mental disabilities. Specifically, it requires "reasonable modifications in policies, practices or procedures." 28 C.F.R. § 35.130(b)(7).

195.    Ms. Garner was suffering from cortical dementia, disorientation and sensory aphasia at the time of this incident. She was, and is, mentally disabled.

196.    Ms. Garner is a qualified individual with a disability under the ADA. She has dementia and sensory aphasia which substantially limit her major life activities by causing her to suffer from serious memory loss and impairment along with extraordinary challenge in her ability to communicate with others.

197.    Title II of the ADA applies to the arrest context. *Gohier v. Enright*, 186 F.3d 1216 (10th Cir. 1999).

198.    Officers Hopp and Jalali chose to treat the common, foreseeable and lawful consequences of Ms. Garner's disabilities (forgetting to pay for items, not understanding commands, being confused and frantic when tackled) as illegal activity (petty theft, resisting arrest, obstruction). This was discrimination in violation of Title II of the ADA. *See Gohier*, 186 F.3d at 1220.

199.    Ms. Garner, by virtue of her mental disabilities, could not speak for herself or understand Officer Hopp's intentions.

200.    The effects of Ms. Garner's disabilities were lawful in fact and treated as criminal by the defendant officers, in violation of the ADA.

201.    The defendants also violated Ms. Garner's rights under the ADA because they failed to reasonably accommodate her disability in the course of investigation and arrest, causing her to suffer greater injury, trauma, and indignity in that process than other arrestees. *See id.*

202.    The defendant officers failed to provide modifications or reasonable accommodations to Ms. Garner in light of her disabilities and the City of Loveland failed to adopt policies and procedures, or adequately train its police officers to safely interact with elderly people who suffer such common disabilities.

203.    Some reasonable accommodations for a person with dementia include employing non-threatening communications, using less confrontational tactics, allowing the passage of time to defuse the situation or waiting for backup. Officer Hopp did none of these things because he was not trained to do any of these things and because it was the custom and practice at Loveland Police to *never* do any of these things.

204.    Loveland boasts in recent news articles to have trained 90% of its officers in Crisis Intervention Team training which is supposed to educate officers on how to de-escalate encounters with those undergoing a mental health crisis or suffering from mental disabilities. If this is true, then the videos in this case further evidence the custom at the Loveland Police of disregarding all training in favor of using needless force and making aggressive arrests wherever possible.

205.   Unlawful discrimination, pursuant to DOJ regulation, includes a failure to make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. 35.130(b)(7).

206.   Ms. Garner's alleged petty shoplifting was reported as non-emergent to Officer Hopp and he also knew that Walmart had not suffered any actual loss as they had recovered the items on site. There was neither exigency to violently arrest Ms. Garner nor did she represent a direct threat to anyone within a hundred miles.

207.   Through the defendant officers, Loveland denied Ms. Garner reasonable accommodations.

208.   Because the officers denied Ms. Garner reasonable accommodations, the defendants caused Ms. Garner to suffer greater injury and indignity in those processes than other arrestees.

209.   The defendant officers knew that accommodations were necessary under Loveland Police written policies but were indifferent to an obvious risk of not providing the accommodations.

210.   The City denied Ms. Garner the benefit of properly trained officers who would be trained to appropriately interact with elderly adults suffering from foreseeable, common place disabilities and reasonably accommodate those individuals.

211.   The City was on notice of the need for more or different training but was deliberately indifferent to that need.

212.   Further, once Defendant Officers Hopp and Jalali had broken and dislocated Ms. Garner's shoulder, she then had yet another disability – this time a physical one, that of a visibly broken and dislocated arm – which the Defendants *again* failed to provide any reasonable accommodation for, leaving Ms. Garner painfully in handcuffs and denying her medical care for over six hours, in violation of not just the Constitution, but yet again the ADA.

213.    As a proximate result of Defendant Loveland's and Defendant officers' actions and inactions, Ms. Garner was injured, suffered physically and emotionally, and continues to experience fear, trauma, and anxiety anywhere outside of her home.

214.    What little sense of freedom and happiness that was left in Ms. Garner's experience of her life as an elderly adult suffering from declining mental health was completely destroyed by the Loveland Police Department.

215.    As a result of the City of Loveland's and its officers' violations of Title II of the ADA, Ms. Garner is entitled to compensatory damages and reasonable attorneys' fees and costs.

**FOURTH CLAIM FOR RELIEF**
*Violations of the Rehabilitation Act – 29 U.S.C. § 794*
(against Defendant City of Loveland)

216.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

217.    Section 504 of the RA forbids programs that receive federal financial assistance to discriminate against individuals with a disability solely because of their disability. 29 U.S.C. § 794(a).

218.    The Loveland Police Department receives federal financial assistance.

219.    Ms. Garner is a qualified individual with a disability under the Rehabilitation Act.

220.    Through the actions of the Defendant officers and through its own failures to train and unlawful customs and practices, Loveland denied Ms. Garner reasonable accommodations for her disabilities.

221.    Because Loveland and its officers denied Ms. Garner reasonable accommodations, Defendant City of Loveland caused Ms. Garner to suffer greater injury and indignity in those processes than other arrestees.

222.    The Defendant officers discriminated against Ms. Garner solely as a result of her disability.

223.    As a proximate result of the Defendant City of Loveland's actions and inactions, Ms. Garner suffered physically and emotionally and continues to experience fear, trauma, and anxiety anywhere outside of her home.

224.    As a result of Loveland's violations of Section 504 of the Rehabilitation Act, Ms. Garner is entitled to compensatory damages and reasonable attorneys' fees and costs.

### FIFTH CLAIM FOR RELIEF
*42 U.S.C. § 1983 – Violation of Fourth Amendment – Failure to Train and Supervise*
(against Defendant Metzler)

225.    Plaintiff incorporates all other paragraphs of this Complaint for purposes of this claim.

226.    Defendant Metzler, as Defendant Hopp and Defendant Jalali's immediate supervisor, had a duty to train and supervise them to ensure they were not engaging in conduct that violated the civil rights of citizens like Ms. Garner.

227.    Instead of carrying out this duty, Defendant Metzler chose to encourage the misconduct of needless escalation, aggression and excessive force witnessed by the Defendants against Ms. Garner in this case, as well as the denial of medical care.

228.    Defendant Hopp's and Jalali's use of excessive force and their illegal seizure and assault upon Ms. Garner was the direct result of Defendant Metzler's deliberate indifference to the civil rights of citizens and of disabled citizens in particular, and his repeated failure and refusal to intervene to supervise, train, or otherwise put a stop to such misconduct.

229.    Defendant Metzler also had specific opportunity to intervene to stop the civil rights violations being inflicted upon Ms. Garner, when he drove to the Walmart and took over the scene. Rather than intervene, however, he personally assisted both Defendants Hopp and Jalali in working to cover up the evidence of their violations of Ms. Garner's civil rights.

230.    Defendant Metzler also set in motion the violations of Ms. Garner's rights when he, over the preceding five years, repeatedly condoned and approved of the needlessly escalatory, aggressive type of arrest and use of force conduct deployed by the officers in this case. As a supervisor, Sergeant Metzler has read report after report from both officers Jalali and Hopp as well as other officers in which it was plain that excessive force had been used, and rather than retrain or supervise the officers, Sergeant Metzler instead complimented and made jokes about the harms they were inflicting upon citizens, and at times (like in this case) would also openly conspire with his subordinates at Loveland to cover up their violations of civil rights.

231.    Defendant Metzler's conduct proximately caused injuries, damages, and losses to Ms. Garner.

**SIXTH CLAIM FOR RELIEF**
*42 U.S.C. § 1983 – 4th Amendment Violation – Municipal Liability for Unconstitutional Custom/Practice, Failure to Train, Failure to Supervise*
(against Defendant City of Loveland)

232.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

233.    All of the acts described herein were done by Defendants Metzler, Hopp and Jalali intentionally, knowingly, willfully, wantonly, maliciously, and recklessly in disregard for Ms. Garner's federally protected rights, and they were done pursuant to the pre-existing and ongoing deliberately indifferent customs, policies and practices of the Defendant City of Loveland, under color of state law.

234.    The Loveland Police Department's customs and practices of unlawful conduct (and failures to train/supervise to prevent the same) proximately causing the harms described herein to Ms. Garner include, but are not limited to:

a. Loveland's custom and practice is to permit its officers to aggressively and violently arrest any citizen at the first sign of possible noncompliance with any command (regardless of whether that command is actually lawful);

b. Loveland's custom and practice is to ignore all its written policies regarding de-escalation, reasonable use of force, appropriate treatment of people with disabilities;

c. It is the custom and practice at Loveland to regularly use excessive force when putting someone into handcuffs and to regularly, needlessly, and deliberately throw individuals to the ground in the process of doing so (which it is their custom and practice to describe in reports as "placing [the person] on the ground");

d. It is the custom and practice at Loveland to try and cover-up and justify excessive use of force incidents by: (1) falsely claiming the person had committed obstruction or resisting after the fact; and (2) ignoring their protocol for writing reports regarding the use of force, so that the CIRT team will not be alerted to investigate their excessive uses of force;

e. It is the custom and practice at Loveland to refuse to discipline its officers for misconduct and to refuse to ever find its officers have engaged in wrongdoing, in the face of obvious and repeated constitutional violations, which resulted in a foreseeable culture of police brutality and silence in the face of ongoing and repeated civil rights violations.

235.    The unlawful conduct of Defendants Hopp, Jalali and Metzler as set forth in detail herein, amounts to a custom and well-settled, widespread overall practice of police brutality deliberately insulated from police accountability, throughout the Loveland police department,

even if not authorized by written law or express municipal policy, and is so permanent and well-settled as to constitute a custom or usage with the force of law.

236.    Through the Defendant Loveland's continuous ratification of unconstitutional detentions, arrests, prosecutions, and excessive force, Defendant Loveland has condoned and become the driving force of the Defendants' unconstitutional conduct.

237.    Defendant Loveland failed to properly train and supervise its officers to avoid their foreseeable use of excessive force, unlawful seizures and abuse of the disabled/elderly.

238.    Defendant Loveland's policies, customs and practices in failing to properly train and supervise its employees were the moving force and proximate cause of the violations to Ms. Garner's constitutional rights.

239.    The custom, policy and practice of Defendant City of Loveland of encouraging, condoning, tolerating, and ratifying the unreasonable and excessive use of illegal seizures and excessive force on citizens, as described herein, were the moving force behind and the proximate cause of, the violations to Ms. Garner's constitutional rights.

240.    Upon information and belief, Defendant Loveland has been deliberately obfuscatory and in other litigation involving excessive force claims against its officers, has made concerted efforts to withhold, destroy, conceal and delay the release of documents and correspondence that relate to the unconstitutional policies, customs, and practices set forth above, and which also evidence Defendant Loveland's unconstitutional practices, customs, failures to train, and supervise defendant officers as set forth above.

241.    The acts or omissions of Defendant Loveland caused Ms. Garner to suffer physical and mental pain, among other injuries, damages and losses.

242.    The actions and omissions of Defendant City of Loveland as described herein deprived Ms. Garner of the rights, privileges, liberties, and immunities secured by the Constitution of the United State of America and caused her other damages.

**SEVENTH CLAIM FOR RELIEF**
***42 U.S.C. § 1983 – 14th Amendment - Substantive Due Process Violation***
(against Defendants Hopp, Jalali and Metzler)

243.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

244.    Officer Hopp's attack upon Ms. Garner's tiny, frail person was outrageous and conscience shocking.

245.    Officer Hopp's and Officer Jalali's joined subsequent effort to purposefully kowtow Ms. Garner by fracturing and dislocating her shoulder, and the things that they both said and yelled at Ms. Garner while doing so, were also outrageous and conscience shocking.

246.    This reality is evidenced in the fact of the concerned citizen who saw all that happened and felt that he had no choice but to stop and confront the officers, demanding to see a supervisor. This reality is even more evidenced by the fact that when the Loveland officers attempted to gaslight the citizen about what he had seen, and yelled at him threatening him with criminal offenses if he continued to complain about what he had witnessed, that he still held his ground.

247.    No one would be able to witness Officer Hopp's needless and pointless attack upon such an elderly lady – in the middle of a field, bothering no one – without feeling traumatized themselves.

248.    Ms. Garner's children, upon viewing the video of what the Defendant officers did to their mother that day, have been deeply traumatized. The brutality and callousness has been so

conscience shocking to them that they have had to seek out counseling to help with their own grief after watching such tortuously outrageous conduct.

249.    There was absolutely no governmental interest served by what the defendant officers did to Ms. Garner that day. The mere 8 seconds of interaction that Officer Hopp let elapse before he violently attacked Ms. Garner was arbitrary, in violation of policy, and outrageous.

250.    The exchanges had between the officers and their on-duty supervisor, Defendant Metzler, particularly the joking about getting "bloody and muddy" and Metzler aiding in covering up the attack by yelling at the concerned citizen and then telling Hopp/Jalali to take Ms. Garner to the jail rather than get her medical care, further solidify this as an act of truly outrageous, deliberate, conscious-shocking government misconduct.

251.    The sudden and violent arrest upon a frail, elderly woman in this case – in the context of just an allegation of unsuccessful petty theft – was so egregious and extraordinary, and so severe, as to amount to brutal and inhumane abuse of official power.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ms. Garner respectfully requests that this Court enter judgment in her favor and against the Defendants and grant:

a.    Declaratory and injunctive relief, as appropriate;

b.    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, loss of liberty, privacy, sense of security and individual dignity, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

c.    All economic losses and damages on all claims allowed by law to be established at trial;

d.    Punitive damages on all claims allowed by law and in an amount to be determined at trial;

e.  Issuance of an Order mandating appropriate equitable relief, including, but not limited to:

    a.  Issuance of a formal written apology from each Defendant to Plaintiff's three children;

    b.  The imposition of policy changes designed to avoid future similar misconduct by Defendants;

    c.  Mandatory training designed to prevent future similar misconduct by Defendants;

f.  Attorneys' fees and the costs on all claims allowed by law;

g.  Pre- and post-judgment interest at the lawful rate; and

h.  Any further relief that this Court deems just and proper, and any other relief as allowed by law.

## VII. REQUEST FOR TRIAL BY JURY

Plaintiff requests a trial to a jury on all issues so triable.

Respectfully submitted this 14th day of April, 2021.

THE LIFE & LIBERTY LAW OFFICE

*s/ Sarah Schielke*
Sarah Schielke
Counsel for Plaintiff
The Life & Liberty Law Office LLC
1209 Cleveland Avenue
Loveland, CO 80537
P: (970) 493-1980
F: (970) 797-4008
E: sarah@lifeandlibertylaw.com