IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-1035-PAB-KLM

KAREN GARNER,

    Plaintiff,

v.

CITY OF LOVELAND, a Colorado municipality,
AUSTIN HOPP, Loveland Police Officer, in his individual capacity,
DARIA JALALI, Loveland Police Officer, in her individual capacity,
SERGEANT PHILIP METZLER, Loveland Police Officer, in his individual capacity,
TYLER BLACKETT, Loveland Community Service Officer, in his individual capacity, and
SERGEANT ANTOLINA HILL, Loveland Police Officer, in her individual capacity,

    Defendants.

_____

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO STAY ALL PROCEEDINGS [ECF 35]**
_____

Plaintiff, Karen Garner, by and through the undersigned counsel, respectfully states for *Plaintiff's Response in Opposition to Defendants' Joint Motion to Stay all Proceedings [ECF 35]* as follows:

**INTRODUCTION**

Plaintiff Karen Garner is an elderly and frail 74-year-old woman suffering from dementia and sensory aphasia. On June 26, 2020, Defendant Loveland Police officer Austin Hopp, with the assistance of Defendant Loveland Police officer Daria Jalali, accosted Ms. Garner in broad daylight while she was walking home picking wildflowers. The Defendant officers threw Ms. Garner to the ground, dislocated her shoulder, broke her arm, and then they hog-tied her. While they did so, she cried out over and over again for home. It was all

1

recorded on video. Their supervising officer, Defendant Sergeant Philip Metzler, arrived and saw that Ms. Garner's blood was literally all over the officers' hands. He laughed with them about it. "A little bloody, a little muddy, that's how it works," they said. Then Metzler marched over to a citizen who had tried to intervene to protect Ms. Garner from the police and who wanted to make a complaint about what he had seen. Metzler told that citizen that his effort to make a complaint was "interfering" with law enforcement. Metzler told the citizen that he needed to "caution" him "about getting this close and involving yourself in law enforcement situations." He told him that the other two officers had "done nothing wrong," and that if the citizen wanted to make a complaint he could drive to the police station and do it, as he (Metzler) was not going to receive it. Metzler, sergeant to countless officers at the Loveland Police Department for nearly 20 years, interrupted, pointed, and yelled at the concerned citizen while making these comments. As he did so, his subordinate officers, looking on, laughed and said: "Good ol' Metzler."

Back at the Loveland Police station, at Metzler's direction, the seriously injured and distressed Ms. Garner was handcuffed to a cell and provided no medical treatment whatsoever. Officer Hopp queued up his bodyworn camera video of the event for multiple other Loveland officers to watch for entertainment. "Ready for the pop? Here comes the pop," he said to Defendant Officers Jalali and Blackett, referencing the sound made when he and Jalali dislocated and broke Ms. Garner's shoulder. While watching the videos, they laughed and laughed. They fist bumped one another and Officer Blackett. Sergeant Metzler came through. He told them what to put in their reports regarding the incident. Sergeant Antolina Hill came through. She laughed at their jokes about "throwing an old lady on the ground" and their annoyance at having to clean Ms. Garner's blood up from the back of their patrol car.

Hill also read Hopp's report and then notarized it, quipping as she left that they could use her "gross car" to transport Ms. Garner to the jail. This too was all recorded.

The following month, multiple *additional* supervisory officers up the chain at the Loveland Police Department reviewed the videos of what happened to Ms. Garner. They found their subordinate officers' (that is, Defendants Hopp's, Jalali's and Metzler's) uses of force on Ms. Garner to be "reasonable and within policy." Then a Larimer County District Attorney reviewed the videos. She dismissed the criminal charges against Ms. Garner, but made no report to anyone about the abuse she saw on those videos. Then, despite our nation's intense ongoing reckoning over problems of excessive force and toxic cultures in policing, for 8 more months, things at LPD carried on, business as usual. In July, six Loveland Police officers brutalized an unconscious man in a Target parking lot, kicking him, punching him, and beating him with batons for "ignor[ing] the officers' commands."[1] Also in July, yet another long-time Loveland supervising sergeant, Robert Pride, (in charge of training incoming Loveland PD patrol officers and a national trustee of Colorado's Fraternal Order of Police), gave an interview to *The Atlantic* in which he complained that a big problem with the police accountability reform legislation being passed in Colorado was that it might "cause hesitation" in "[his] guys" before they used force on citizens.[2] In January, Loveland settled for $290,000 - without admission of fault - another excessive force lawsuit, one that had been

---

[1] "Activists demand DA drop charges against Black man arrested, 'brutalized' outside Loveland Target," *Coloradoan* (July 21, 2020) accessible at https://www.coloradoan.com/story/news/2020/07/21/loveland-police-say-use-force-acceptable-arrest-black-man-outside-target/3287762001/

[2] R. Berman, "The State Where Protests Have Already Forced Major Police Reform," *The Atlantic* (July 17, 2020) accessible at https://www.theatlantic.com/politics/archive/2020/07/police-reform-law-colorado/614269/

filed (with its video also going viral and causing public outrage)[3] *just four days before* the Defendant officers' attack on Karen Garner.[4] In February, Officer Hopp was celebrated by the Loveland Police Department and given an award at their annual ceremony. Also in February, Chief of Police Robert Ticer bragged to news outlets and the Loveland City Council that he would put his officers' mental health training "up against just about any agency in America."[5]

Then, on April 14, 2021, Ms. Garner filed the instant lawsuit against the City of Loveland and its officers, and released the videos to the public. The world recoiled in horror and disbelief. Within weeks, the videos amassed over 10 million views over multiple outlets online. Questions abounded. *How could something like this happen? How, knowing they were on camera? How, with so many other officers present? How?* Ms. Garner's arrest and mistreatment at the hands of LPD became the subject of both national and international rebuke through hundreds of stories, posts, and headlines. The same Larimer County District Attorney's office that had just months before done nothing with the videos, now announced criminal charges against two of the officers based on those videos. Chief Ticer, meanwhile, set to proclaiming in press conference after press conference that those two once award-winning but now criminally-charged officers (Hopp and Jalali) were "not the Loveland Police Department." Hundreds of citizens called and emailed the City and Police Department

---

[3] "Man sues Loveland Police Department alleging excessive force," *The Denver Post* (June 23, 2020) https://www.denverpost.com/2020/06/23/man-sues-loveland-police-department-alleging-excessive-force/

[4] There were four defendant Loveland officers named in Mr. Sowl's case. *They are all different from the four named defendant Loveland officers in Ms. Garner's case*.

[5] M. Levy, "Council to Look Again at How Mental Health Clinicians Are Embedded in Loveland Police," Loveland Reporter-Herald (February 16, 2021) accessible at https://www.reporterherald.com/2021/02/16/council-to-look-again-at-how-mental-health-clinicians-are-embedded-with-loveland-police/

demanding he resign.[6] He refused. Today he, Sergeant Metzler, and Sergeant Hill all remain employed and in positions of leadership at the Loveland Police Department.

To attempt early mediation, this civil case was briefly stayed. That mediation was unsuccessful. In the three weeks since, the public has continued pressing for answers as to who within LPD knew about the Garner incident and who fostered the culture and environment where something like that would occur. To impose accountability, the public needs transparency. But it is getting neither. Loveland has locked down all avenues of public information access, citing "ongoing investigations" and the "pending civil case." Meanwhile, Chief Ticer exploits the information monopoly. Most recently (two weeks ago), he wrote an op-ed to the local paper proclaiming that the Loveland Police Department is "more empathetic and more effective" than ever.[7]

Now, all case Defendants – together – have moved this Court for an indefinite and "complete stay of discovery" in Plaintiff Ms. Garner's case. Not just the two criminally charged Defendants. But *all* of the Defendants, including the City of Loveland. In support, they cite Hopp and Jalali's Fifth Amendment rights generally, [ECF 35] *Motion to Stay*, p. 6, and they cite "convenience." *Id.* at 14. They propose no narrowly tailored alternatives to a complete stay. There are many. Respectfully, for the reasons detailed herein, Defendants' Motion must be denied.

---

[6] So many people called 911 to express their outrage over Karen Garner and demand Ticer's resignation, in fact, that Loveland had to issue multiple requests to the public through news outlets asking that people make their complaints in writing, as the calls were interfering with the City's ability to dispatch responders to live emergencies.

[7] Bob Ticer, "Opinion: Loveland Police Department is becoming more empathetic, more effective," *Loveland Reporter-Herald* (July 16, 2021) accessible at https://www.reporterherald.com/2021/07/16/bob-ticer-loveland-police-department-is-becoming-more-empathetic-more-effective/

## APPLICABLE LAW

Stays are generally disfavored in this District, for a number of reasons, including the prejudice it causes to the prompt administration of justice as well as to the public's perception of that administration of justice. *Yeiser v. DG Retail, LLC*, 2019 WL 3521903, at *5 (D. Colo. Aug. 1, 2019). "[T]he decision to grant or deny [a stay] invokes the discretion of the Court under the circumstances at issue." *Bitco Gen. Ins. Corp. v. Genex Constr. LLC*, 2016 WL 8608452, at *1 (D. Colo. Sept. 13, 2016). "The party who seeks a stay of discovery has the burden of demonstrating good cause, and cannot sustain that burden by offering simply conclusory statements." *Id.* Instead, "the Court requires a particular and specific demonstration of fact in support of a request for a stay." *Id.* Here, that means a particular and specific demonstration of "substantial prejudice to a party's rights" without the stay. *Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1080 (10th Cir. 2009).

In the context of ruling on a motion to stay, the Tenth Circuit has stated that "the right to proceed in court should not be denied except under the most extreme circumstances." *Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc.*, 713 F.2d 1477, 1484 (10th Cir. 1983). Parallel civil and criminal actions might, in "special circumstances," raise problems, however the mere fact of parallel civil and criminal actions alone does not require a stay. *United States v. Kordel*, 397 U.S. 1, 11-12 (1970). "In other words, stays of the normal proceedings of a court should be the exception rather than the rule." *Hilda M. v. Brown*, 2010 WL 5313755, at *3 (D. Colo. 2010).

Motions to stay a civil case pending a parallel criminal matter are decided by examining six factors: (1) the extent to which the issues in the criminal case overlap with those presented in the civil case; (2) the status of the criminal case; (3) the interests of, prejudices to, and burden on the plaintiff; (4) the interests of and burden on the defendant;

(5) the interest of the court; and (6) the public interest. *AIG Life Ins. Co v. Phillips*, 2007 WL 2116383, at *2 (D. Colo. July 20, 2007).

Should a particular Defendant successfully make a specific and compelling demonstration of substantial prejudice, "a general stay is just one of several procedures available." *In re CFS-Related Securities Fraud Litigation*, 256 F.Supp.2d 1227, 1236 (D. Okla. 2003). Numerous alternate tools may be utilized in lieu of imposing a stay, including "the imposition of protective orders, sealed interrogatories, a stay for a finite period of time, or a stay limited to a specific subject matter." *DTC Energy Group, Inc. v. Hirschfeld*, 2019 WL 9512846, at *1 (D. Colo. Aug. 9, 2019) (quotations omitted).

## SUMMARY OF THE ARGUMENT

Examination of those six factors in the context of this case's circumstances counsels denying the Defendants' requested blanket stay. It may be inconvenient to Hopp and Jalali to face both proceedings simultaneously but that inconvenience pales in comparison to the prejudice and harm that Plaintiff Ms. Garner, her family, and the public would suffer from a complete case stay. Ms. Garner is not an ordinary plaintiff with the usual generalized interest in her civil case's progression - she is elderly, frail, and has dementia. Her life expectancy is limited. She has considerable pain and suffering compensatory damages. And, if she passes during the pendency of this case, Defendants will argue that her damages for pain and suffering died with her.[8] This is worth repeating: the very Defendants who inflicted upon Ms.

---

[8] This is certainly a possibility on the federal claims, as the issue of whether damages for pain and suffering survive death in a § 1983 civil rights action awaits concrete resolution in the Tenth Circuit. Ms. Garner does intend to move to amend her complaint to add state civil rights claims pursuant to § 13-21-131, C.R.S. (subsection (2)(a) of § 13-21-131 eliminated the statutory limitation on noneconomic damages after death in state civil rights claims), but that will not mitigate entirely the advantages and windfall Defendants might obtain by stalling the case until Ms. Garner's passing.

7

Garner the harms that destroyed what was left of her life,[9] can – should the Court impose the broad and indefinite case delays the Defendants seek – victimize her and her family even further by profiting from her passing. It is hard to imagine a civil plaintiff more powerless, vulnerable and in need of this Court's protection than an 80-pound, 74-year-old woman with dementia, but should Defendants achieve a windfall in this case by virtue of stalling it through Plaintiff's death, we will certainly see it.

The public, meanwhile, has not just tremendous interest in the prompt progression of this case, but a need for it. The allegations in Ms. Garner's Complaint regarding leadership and culture at the Loveland Police Department represent an urgent matter of community health and safety. Plaintiff's counsel did not provide the historical outline of this case's public aspects above for dramatic effect. Rather, this context is provided to put into vivid color a core, primary reality of this case: That the City of Loveland will not make changes to policing leadership, personnel, or policy unless it is forced to by public pressure and this very litigation. It is precisely the type of entity that section 1983 impact litigation exists to correct. But that correction cannot occur without progression of discovery in this civil case.

## ARGUMENT

1. **Factors 1 and 2: Defendants Loveland, Metzler, Blackett and Hill do not have pending criminal cases nor cognizable claim to avoid participation in discovery.**

Factors 1 and 2 ask whether there is overlap of issues between a criminal case and a civil case and whether Defendants have in fact been charged. Plaintiff agrees there exist considerable shared facts between the criminal case and this civil case. However, only

---

[9] "Dementia is burden enough in its own right. … "[B]ut, when violence happens, the world does not seem safe, orderly, or worthy of investing energy in it. The victim's sense of meaningful purpose in life may be shattered." Flannery, R., "Addressing psychological trauma in dementia sufferers," *American Journal of Alzheimer's Disease and Other Dementias* Vol. 17, No. 5 (September 2002).

8

Defendants Hopp and Jalali have been criminally charged, and they have only been charged criminally regarding Ms. Garner's original injury (the breaking of her arm and shoulder) event. Notably, all of those events are recorded on video.

The remaining four Defendants, however, do not have pending criminal cases or investigations. To boot, the district attorney has publicly announced that he does not plan to file any criminal charges against those four Defendants. Thus, even if consideration of these two factors were found weighty enough to counsel some form of intervention for Defendants Hopp and Jalali, with respect to the other four Defendants who have been assured of facing no criminal liability, "a general stay of the action is an overly broad remedy." *AIG Life Ins. Co. v. Phillips*, 2007 WL 2116383, at *3 (D. Colo. July 20, 2007).

2. **Factor 3: The interests of, prejudices to, and burden on the plaintiff associated with a general stay of this case are extreme.**

Plaintiff Ms. Garner has significant, plenary interests in the expeditious continuation of her civil case's discovery. First, she has brought numerous complex *Monell* claims related to unconstitutional policies, practices, customs and training/supervision issues at City of Loveland. Memories of witnesses and availability of documents that are the literal foundation for those claims are at extraordinary risk of loss in the passage of time. *See, e.g. Estate of Bailey v. City of Colo. Springs*, 2020 WL 6743789, at *3 (D. Colo. Nov. 17, 2020) (the longer that Plaintiffs must wait to obtain discovery, the more likely its value will be diluted because "the memories of the parties and other witnesses may fade with the passage of time, witnesses may relocate or become unavailable, or documents may become lost or inadvertently destroyed"). Discovery with respect to these claims is inevitable. It will rely heavily on witness testimony and memory. Unlike the discovery related to Hopp's and Jalali's criminal cases (which is largely all on video), discovery related to Ms. Garner's supervisory

9

and *Monell* claims is not so pristinely preserved. To indefinitely deny a plaintiff speedy access to that type of discovery in particular tends to have the practical result of weakening or destroying it.

Second, trial has not been set in either Defendant Hopp's or Jalali's criminal cases. We are in the midst of a pandemic due to COVID-19. Court rules have been changed to create exceptions to Speedy Trial Act considerations and permit lengthy, indefinite delays on cases being brought to trial. Where once there might have been some guarantee of a criminal case proceeding more expeditiously than a civil case, now there is no such reasonable expectation. The broad, blanket stay on this case sought by Defendants is thus also an open-ended and indefinite one.

Plaintiff has a "powerful interest in avoiding an open-ended, indefinite stay and proceeding expeditiously with [her] case." *Estate of Elijah McClain v. City of Aurora, et al*, 20-CV-02389-DDD-NRN, at *11 (D. Colo. Jan. 29, 2021). The two individual Defendants' countervailing burden "does not outweigh this interest because 'the Tenth Circuit affirms that a defendant has no right not to choose between testifying in a civil matter or invoking his/her Fifth Amendment rights." *Id.* (quoting *Brancato v. Panio*, 2012 WL 6137472, at *2 (D. Colo. Dec. 7, 2012)). There is literally no current prospect of when Defendant Hopp or Defendant Jalali might have a criminal trial (if at all) and indeed, if the broad stay sought were granted by this Court, it would make abundant strategic sense for both Defendants to delay resolution of their criminal cases for as long as humanly possible. Given the additional means of delay provided via the pandemic, this could equate to more than 2 years of continuances in the criminal case, during which this civil matter would have progressed nowhere, developed no facts, lost critical evidence, and ultimately gone stale while burdening the Court's docket.

Third, as mentioned above, the broad and indefinite stay of discovery sought by Defendants in this case risks Plaintiff's ability to recover from Defendants. Not just in the general sense, *Hilda M. v. Brown*, 2010 WL 5313755 at *5 (D. Colo. Dec. 20, 2010) ("The court recognizes that this is a legitimate concern for all plaintiffs"), but in a very specific sense due to Ms. Garner's age, health, disease, and the trauma the Defendants inflicted upon her. *Compare id.* ("Plaintiffs *have not asserted that the aging plaintiffs are in poor health*") (emphasis added). Thus even the scope, nature and damages available to Ms. Garner could be prejudiced by the granting of an indefinite blanket stay in this case.

Finally, brief further comment as to plaintiff's interests is warranted in the context of how public this case has become. Ms. Garner and her family have sacrificed and lost a lot as a result of bringing this suit against Loveland. Not just lost happiness together; but in suffering, and having to watch the videos of her assault over and over and over again. Every time they turn on a TV, there is "the pop," there Ms. Garner is, crying for home. Their friends, acquaintances and colleagues see them now not as themselves, but through the lens of the relationship they have with their infamously abused and traumatized mother. Ms. Garner's own legacy is this case and how she is treated in it. To deny to Ms. Garner and her family access to both the preservation and progression of information that they need to move their lives forward would serve to further victimize plaintiff and her loved ones, while accomplishing nothing beyond affording convenience and undeserved windfalls to the Defendants.

3. **Factor 4: Defendants have not articulated any specific harms they would face without a stay and already have "inefficient" discovery processes ongoing with respect to the facts underlying Ms. Garner's claims.**

Defendants dedicate some pages of their *Motion* citing on this factor the concern that "discovery efforts in this case might result in information being provided that is beyond that allowed by criminal procedure." [ECF 35] *Motion to Stay*, at 9-11. They cite cases like *Davis*

*v. United States* and *Fine v. Tumpkin* in support. *Id.* Yet this type of argument really only finds purchase in cases where the plaintiff in the civil matter shares identity or agency with the prosecuting party in the criminal matter. In those circumstances, use of the civil discovery process to evade or expand discovery processes in the criminal case is a legitimate concern. But those facts are not present here. Ms. Garner has no access to the district attorney's office's criminal case discovery. The DA's office has no access to Ms. Garner's discovery. And perhaps most apposite, the City of Loveland has commissioned Hillard Heintze, an independent consulting firm, to "work with the city on an independent assessment of … Karen Garner's arrest and … current practices."[10] These independent reviews are going on *right now* due to the City's publicly proclaimed "urgency to move forward," and should be completed, according to the City's news release, within six months.[11] This independent assessment will naturally entail dozens upon dozens of interviews with key witnesses at the heart of every single one of Ms. Garner's civil claims, as well as detailed requests for and investigations through thousands of documents related to this incident and Loveland policy. It defies credulity that while all this goes on in Loveland, Defendants are simultaneously claiming in their instant *Motion* that without a blanket stay on just Ms. Garner's discovery efforts, they will face "unfairness and prejudice … resulting in inefficiencies and inadequacies in the discovery process when the parties inevitably seek information that cannot be disclosed during the ongoing criminal prosecution." [ECF 35] *Motion to Stay*, at 10-11. *See also id.* at

---

[10] A. Streetman, "Loveland Hires Public Safety Firm Hillard Heintze for Independent Review of Karen Garner Arrest," *CBS4 Denver* (June 18, 2021) accessible at https://denver.cbslocal.com/2021/06/18/loveland-karen-garner-arrest-independent-review-hillard-heintze/

[11] NEWS RELEASE: City of Loveland Moves Forward with Police Department Independent Investigation and Assessment, City of Loveland (June 17, 2021) accessible at https://www.lovgov.org/Home/Components/News/News/6460/1993

12-13 (where Defendants argue that "[a]llowing discovery to proceed in a piecemeal fashion constitutes an inefficient use of judicial resources and would be prejudicial to all Defendants"). This type of "we will do an in-depth investigation of ourselves and then let someone else interview all the critical witnesses and decide what documents are important and also the plaintiff can't participate because two defendants have a criminal case, and for good measure she also has to wait 2+ years to attempt that very same fact discovery process anew" makes utterly no sense from an efficiency standpoint, and is positively backwards from a fairness and equity standpoint.

4. **Factor 5: The Court has a strong interest in keeping this case moving to conclusion without unnecessary delay.**

Discovery as to *all* of Ms. Garner's claims, both *Monell* and individual, is inevitable. Defendants did make reference in their *Motion* to plans to invoke qualified immunity for individual defendants should their instant effort to obtain a blanket stay fail, however, as mentioned *supra*, Ms. Garner will shortly be moving to add state law civil rights claims to her lawsuit pursuant to § 13-21-131, C.R.S. Those claims rest on identical facts to the federal civil rights claims under 42 U.S.C. § 1983, and qualified immunity is not an available defense to those claims. If Defendants do intend to invoke qualified immunity as to the individual federal claims, they certainly may, but it is not going to aid in stalling discovery in this case. Discovery is inevitable on both the *Monell* claims and the state individual claims. Further, Ms. Garner has brought ADA claims. Discovery on these claims too is inevitable, subject to neither qualified immunity defenses nor associated QI discovery stays.

Given the inevitability of discovery as to all the facts underlying all of Ms. Garner's claims, the Court's interests here doubly disfavor any type of stay. It is, put simply, "not convenient

for the Court to have stale cases cluttering its docket," *Patterson v. Santini*, 2014 WL 349085, at *7 (D. Colo. Jan. 31, 2014), and certainly not under circumstances like these.

5. **Factor 6: The public interest very strongly weighs against a stay.**

The public does not just have an "interest" in the expeditious progression of this case; the public has a well-established *need* for the expeditious progression of this case. The allegations in Ms. Garner's Complaint regarding leadership and culture at the Loveland Police Department indicate urgent matters of community health and safety. The implications of Plaintiff's claims in this case "have a far broader impact than just upon" Plaintiff, even "beyond the public's general interests in the expeditious resolution of civil matters." *Sanchez v. Hartley*, 2016 WL 7176718, at *6 (D. Colo. Apr. 26, 2016). As set forth on pages 2-5, *supra*, in addition to the public generally, Ms. Garner's immediate family also has pressing need for this case to move forward. The public naturally has urgent questions about how so many officers at one police department could possibly participate in and approve of what happened to Ms. Garner. Those questions are not going to be answered by Hopp and Jalali's criminal cases.

6. **Even if there were a specific concern of substantial prejudice to Hopp or Jalali, there are numerous alternatives to a general stay that would not inflict such broad and haphazard prejudice to Ms. Garner's, the Court's, and the public's interests.**

There are plenary less drastic alternatives to a general stay available, and it is notable that Defendants as a group proposed exactly none in their *Motion*. If the "Hobbesian dilemma" that all Defendants raised for Hopp and Jalali were a real concern, more common solutions targeted to exactly those problems ought to have been raised. *See, e.g., In re CFS-Related Securities Fraud Litigation*, 256 F.Supp.2d 1227, 1240 (N.D. Okla. 2003) ("Other courts have noted a variety of procedures that can be utilized to lessen the detriment to a defendant facing such a quandary. Less drastic methods in lieu of a stay include sealing answers to interrogatories, sealing answers to depositions, imposing protective orders, imposing a stay

for a finite period of time, limiting a stay to a particular subject, or limiting disclosure only to counsel."). An open-ended, indefinite, total stay of all progression of this case is simply not a sensible option. Not only does it position Defendants to benefit from numerous evidentiary and legal windfalls at Plaintiff's direct expense, but it remains entirely unnecessary, proclaiming to solve problems that do not even exist. For, like in *In re CFS-Related Securities Fraud Litigation*, "[t]he detriment to [Defendants] from any negative inferences is speculative at this point. When the civil proceedings to go trial, the criminal proceedings should be resolved, and [Defendants] will have different considerations as to the need for Fifth Amendment protections." *Id.* at 1241.

Far more sensible solutions to the currently speculative concern raised by Defendants here include imposing a protective order for Hopp's and Jalali's depositions and interrogatories or postponing Hopp and Jalali's depositions and interrogatories until after their criminal proceedings have concluded.[12] *See, e.g. id.* at 1240-41 ("The Court finds that a sensible option to resolve this issue is to decline the imposition of a stay of discovery against [Defendant], seal his deposition, and direct that it not be used for any purpose outside the civil proceeding except for perjury or impeachment."). Whatever the Defendants' true worry, the answer is not an indefinite total stay of all progression of this case. That proposal is antithetical to all notions of justice, fairness, civil rights litigation, and the extraordinarily weighty public safety and public policy interests in this case. Respectfully, Defendants' *Motion to Stay* should be denied.

---

[12] At the parties' 26(f) conference on July 14, Defendants proposed an 8-month discovery period. If, as their Motion suggests, they are presuming that Hopp's and Jalali's as-yet-unscheduled criminal trials will occur within speedy trial guidelines despite the pandemic, that leaves 2 full months at the end of the discovery period for those two defendants' civil discovery.

        *s/ Sarah Schielke*
        **Sarah Schielke**
        The Life & Liberty Law Office
        1209 Cleveland Avenue
        Loveland, Colorado 80537
        Email: sarah@lifeandlibertylaw.com
        *Attorney for Plaintiff Karen Garner*

## CERTIFICATE OF SERVICE

This is to certify that on August 4, 2021, a true and accurate copy of the foregoing has been sent to the following parties by PACER/ECF electronic service:

Eric M. Ziporin
Kate M. Sandlin
SGR, LLC
*Attorney for Defendant City of Loveland*

Sara L. Cook
Gordon Vaughan
Vaughan & DeMuro
*Attorney for Defendant Austin Hopp*

Jonathan M. Abramson
Yulia Nikolaevskaya
Kissinger & Fellman, P.C.
*Attorney for Defendant Daria Jalali*

Katherine M.L. Pratt
Wells, Anderson & Race, LLC
*Attorney for Defendant Antolina Hill*

Josh A. Marks
David J. Goldfarb
Berg Hill Greenleaf Ruscitti LLP
*Attorney for Defendant Philip Metzler*

Peter H. Doherty
Lasater & Martin, P.C.
*Attorney for Defendant Tyler Blackett*

        *s/ Sarah Schielke*